Charles ROBERTS, Plaintiff–Appellee,

v.

GADSDEN MEMORIAL HOSPITAL, Defendant–Appellant.

Gadsden County, Florida, Defendant.

No. 86–3826.

United States Court of Appeals, Eleventh Circuit.

Jan. 13, 1988.

Benjamin B. Culp, Jr., David Charles Whitlock, Fisher & Phillips, Atlanta, Ga., for defendant-appellant.

Danni Vogt, Tallahassee, Fla., Steven L. Seliger, Quincy, Fla., for plaintiff-appellee.

Before HILL and VANCE, Circuit Judges, and SPELLMAN,* District Judge.

SPELLMAN, District Judge:

This is a Title VII case in which the trial court found, *inter alia*, that the Defendant, Gadsden Memorial Hospital (GMH) discriminated against the Plaintiff, Charles Roberts (Roberts), on the basis of race in denying him fair promotion opportunities in July, 1978, and November, 1981. The trial court further found that these two incidents arose out of pattern or practice of discrimination which constituted a "continuing violation" by GMH of Roberts' civil rights. Accordingly, the trial court awarded Roberts damages based on the difference between his salary and those of the maintenance supervisors that GMH promoted in his place, prejudgment interest, costs, and attorneys fees.

Upon careful review, we find that the District Court's conclusion that GMH wrongfully discriminated against Roberts in 1981 was supported by substantial evidence. The court's conclusion that the 1978 and 1981 incidents were so sufficiently related as to constitute a continuing violation, however, was clearly erroneous. *See Pullman–Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982); *Carmichael v. Birmingham Saw Works,* 738 F.2d 1126, 1129 (11th Cir.1984). Therefore, Roberts' 1978 claim was time-barred and he was not entitled to damages for injuries occurring prior to 1981. Accordingly, we AFFIRM in part and REVERSE in part.

## I. Facts

The trial court made extensive findings of fact which we find instructive: Gadsden County, Florida, owns and operates the Defendant–Appellant hospital (GMH). GMH employs more than fifteen people and is an employer within 42 U.S.C. section 2000e. Roberts began his career at GMH in 1966 where he worked in the maintenance department until resigning in 1972. In Sep-

tember, 1976, Roberts returned to GMH's maintenance department as a participant in the county's Comprehensive Employment and Training Act (CETA) program. Roberts' duties under this program were equivalent to those of a regular maintenance employee. Roberts also alternated on a weekly basis with Gerald Allen, the supervisor during this time period, in being "on call" to respond to after-hours maintenance problems. Moreover, he "served as supervisor of eight to ten other CETA workers assigned to GMH. In this capacity, [Roberts] assigned work areas, picked up supplies, kept time, and evaluated performance." Findings of Fact & Conclusions of Law, (R–58–2).

In August, 1977, GMH appointed Corry Wilhoit, a white male, to serve as maintenance supervisor at a wage of $4.42 per hour after Gerald Allen resigned. Although Roberts had known of the vacancy, he had not applied for the supervisory position. Subsequently, however, on January 2, 1978, GMH hired Roberts as a full-time maintenance worker. Although this entailed Roberts' leaving the CETA program, his duties remained substantially the same.

In July, 1978, Wilhoit resigned, recommending Roberts as his replacement. The GMH administrator at that time, Ed Carter, offered the position to Roberts without a concomitant wage increase so that, whereas Wilhoit had been earning $4.42 per hour, Roberts was offered only $3.50 per hour for the same work. The trial court found no credible explanation in the record for this wage disparity. Roberts rejected the "promotion" because of the discriminatory wage, but temporarily performed the duties of maintenance supervisor for one month until GMH hired David Beach, a white male, for the position at a wage of $5.50 per hour. (R–58–3).

Beach remained in this position until November 20, 1981, when the new hospital administrator, Ken Arnold, forced his resignation and replaced him on the same day with Michael Harrison, a white male who

---

* Honorable Eugene P. Spellman, U.S. District Judge for the Southern District of Florida, sitting by designation.

had been working as a hospital scrub technician for three weeks at that time. Arnold considered no one but Harrison for that position. (R–58–3). Arnold filled the position of maintenance supervisor in an informal and secretive manner. (R–58–3, 8).

After satisfying all administrative and procedural prerequisites, Roberts sued GMH for wrongfully failing to promote him to this position on the basis of his race.

## II. Discussion

Roberts' claim was essentially that GMH discriminated against him in denying him fair promotion opportunities in 1977, 1978, and 1981, and that these incidents demonstrate the existence of a continuing violation such that the earlier two claims were not time-barred, but rather, were preserved under the scope of the "continuing violation" doctrine. The District Court found that racial discrimination was not involved in the 1977 incident. As Roberts did not appeal this finding, we need focus our discussion only upon the 1978 and 1981 incidents and whether these incidents, taken together, constituted a "continuing violation."

### A. The 1981 Incident

The record supports the District Court's finding that Roberts established a prima facie case of racial discrimination in the 1981 incident, which GMH failed to rebut. In *McDonnell Douglas Corp. v. Green*, the Supreme Court set forth the complicated burden-shifting analysis for proving, by indirect evidence, a Title VII claim of racially disparate treatment. 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To establish a prima facie case, a plaintiff is required to prove that "he or she is a member of a protected minority, was qualified for and applied for the promotion, was rejected despite these qualifications, and that other employees with equal or lesser qualifications who were not members of the protected minority were promoted." *Perryman v. Johnson*

*Products Co.,* 698 F.2d 1138, 1142 n. 7 (11th Cir.1983).

Once a plaintiff has established a prima facie case, thereby raising an inference that he was the subject of intentional race discriminated, the burden shifts to defendant to rebut this inference by presenting legitimate, non-discriminatory reasons for its failure to select the plaintiff for the position sought. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the employer fails to satisfy this burden, the inference of intentional discrimination stands unrebutted and the plaintiff is entitled to judgment as a matter of law. *Id.*

If, however, the employer successfully articulates a legitimate non-discriminatory reason for the action, the plaintiff must next establish by a preponderance of the evidence that a discriminatory intent motivated the employer's action. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825; *Perryman*, 698 F.2d at 1142. A plaintiff may carry this burden either indirectly, by showing that the defendant's proffered explanation is pretextual, or directly, by showing that a discriminatory reason more likely motivated the defendant's action. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *Perryman*, 698 F.2d at 1142. By successfully meeting this burden, the plaintiff creates a presumption that the adverse employment action was the product of discriminatory intent. The employer may rebut this presumption only by showing that the adverse action would have occurred even in the absence of discriminatory intent. *Mount Healthy City School District Board or Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Perryman*, 698 F.2d at 1142.

Although the burgeoning progeny of *McDonnell Douglas* often treats the shifting burden test as an inflexible yardstick, the Supreme Court has cautioned that it intended the test to function more as an evidentiary guide to determine the ultimate question in a racial discrimination case under Title VII: whether the employer discriminated against the claimant on the basis of race. *United States Postal*

*Service Board of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983). For example, when the failure to promote arises out of an informal, secretive selection process, as the District Court found occurred in the case at bar, a plaintiff may raise an inference of intentional, racially-disparate treatment without proving that he technically applied for, and failed to obtain, the promotion. *Carmichael v. Birmingham Saw Works,* 738 F.2d 1126, 1133 (11th Cir.1984). Accordingly, rather than technically retrace the District Court's steps through the *McDonnell Douglas–Burdine* test, we will engage in a more flexible analysis to determine whether the record supports the district court's finding that Roberts successfully raised an inference of intentional racial discrimination, which GMH failed to rebut. *See Hill v. Seaboard Coast Line Railroad Co.,* 767 F.2d 771, 773 (11th Cir. 1985); *Carmichael,* 738 F.2d at 1129. It is this Court's opinion that such a finding was not clearly erroneous.

Soon after beginning his job as hospital administrator and relocating to Quincy, Florida, the site of GMH, Arnold, concerned with the status of the hospital facilities, began investigating Beach's competence as maintenance supervisor. (Defendant's Exhibit # 3–Composite). At about the same time, he began to socialize with certain members of the hospital staff, one of whom was Michael Harrison, the husband of a GMH nurse (R4–79). On the same day that Arnold terminated Beach's employment, he offered the position to Harrison. Arnold had never posted notice of the "open" position and gave no one an opportunity to apply.

The record supports the trial court's finding that although Roberts, a member of a protected race, was more qualified than Harrison for the position, Arnold awarded the promotion to Harrison, a white male. At trial, in defending the qualifications of his hiring choice, Arnold placed undue emphasis on the fact that Harrison had completed college. As the District Court noted, "There is no evidence [in the record] that Harrison ever demonstrated managerial skills." Certainly, the fact that Harrison had achieved a degree in horticulture did not overshadow Roberts' cumulative experience of more than a decade of "hands-on" maintenance experience at GMH.

The record demonstrates that as far back as 1978, Roberts was, in fact and in GMH's perception, highly qualified for the promotion. As the District Court noted, "That the position was offered to [Roberts in 1978] is the best evidence of his qualification to be maintenance supervisor." Moreover, Wilhoit, the previous maintenance supervisor, who had had extensive opportunity to observe Roberts on the job, recommended Roberts as his replacement upon resigning. Roberts had had years of experience in the department and, on occasion, had acted as supervisor. Moreover, in 1977 and in 1978, GMH tried to take Roberts out of the CETA program and make him a permanent GMH employee. The testimony supports the District Court's conclusion that the hospital depended on him (R4–10), and that he was certainly qualified for the job in 1978. Between that year and 1981, he had had three more years of experience. It is clear that this evidence supports the conclusion that Roberts was highly qualified for the position at the time Arnold awarded it to a lesser-qualified white employee.

Moreover, the trial court reasonably concluded that the previous gross mismanagement of the maintenance department provided no defense to Arnold's failure to consider Roberts for promotion. Had GMH offered a fair promotion to Roberts in 1978, perhaps the condition of the hospital in 1981 would have been satisfactory. Certainly, GMH could not hold Roberts accountable for failing to perform gratuitously, prior to 1981, the job for which he was wrongfully passed over in 1978. Roberts had no duty to do anyone's job other than his own. The evidence supports the notion that he did his own job well.

It appears that Harrison's de factor qualification consisted of attending the same barbecues as Arnold and becoming a "drinking buddy" of the hospital administrator. (Arnold's and Harrison's Testimony at R4–79, 86, 117). Arnold acknowl-

edged the importance of these social gatherings in his hiring decision. *Id.* Moreover, the record offers no evidence that Harrison possessed any legitimate managerial skills. The record supports the conclusion that this promotion decision was nothing more than a typical "good ol' boy" appointment.

Unfortunately for Roberts, he was not on the guest list for these momentous social gatherings. As Arnold testified, "Mr. Roberts never entered [his] mind as a candidate for that position." (R4–82). Arnold never considered whether Roberts, a maintenance staff member, possessed the qualifications necessary to serve in a supervisory capacity. He simply "never thought to inquire." (R4–85). The record demonstrates that on numerous occasions, Roberts had demonstrated such skills. He was far more qualified than a mere "handyman." Certainly, had it occurred to Arnold to *consider* the veteran employee for the position, he would have discovered Roberts' qualifications.

This Court has noted on numerous occasions that informal, secretive and subjective hiring or promotion decision processes tend to facilitate the consideration of impermissible criteria, such as race. *See, e.g., Cox v. American Cast Iron Pipe Co.,* 784 F.2d 1546, 1560 (11th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 274, 93 L.Ed. 2d 250 (1986); *Hill v. Seaboard Coast Line Railroad Co.,* 767 F.2d 771, 775 (11th Cir. 1985); *Carmichael v. Birmingham Saw Works,* 738 F.2d 1126, 1133 (11th Cir.1984); *Watson v. National Linen Service,* 686 F.2d 877, 881 (11th Cir.1982); *Rowe v. General Motors Corp.,* 457 F.2d 348, 359 & n. 23 (5th Cir.1972); *see also Payne v. Travenol Laboratories, Inc.,* 673 F.2d 798, 827 (5th Cir.1982).

In *Carmichael,* an employer awarded a promotion to a white employee with less seniority than a black employee of good standing. The promotion process was completely informal and provided no checks against racial bias. The only means by which an employee received notice of a promotion opportunity was by word of mouth. 738 F.2d at 1132–33. The record demonstrated that it was during lunchbreak that word of mouth circulated. Lunchbreak, however, was a time when most of the black employees' coworkers, who were white, socialized together with the foreman. The record showed that the plaintiff was made to feel unwelcome at these lunch gatherings. *Id.* at 1133 n. 2. Needless to say, the plaintiff preferred to dine alone and never reaped the fruits of the white grapevine. *Id.* Under those facts, we held that the employer had a *duty* to consider the black employee for the position. *Id.* at 1133–34; *see also Cox,* 784 F.2d at 1560 (quoting *Carmichael,* 738 F.2d at 1133). The employer was not entitled to assume that the employee was not interested. *Id.*

The facts of *Carmichael* are remarkably similar to those of the case *sub judice.* Arnold's selection process was more secretive than that of the employer in *Carmichael.* His decision to award the position to Harrison was largely a function of their after-hours social relationship. Thus, access to promotion was placed even further beyond Roberts' reach than was the case in *Carmichael.*

GMH seeks to assert in its defense that it is not guilty of disparate treatment because Arnold never considered Roberts for the position. Failing to consider Roberts in itself constituted disparate treatment under these facts. Our holding in *Carmichael* allows no other result. This is especially true inasmuch as Roberts had applied for the position in 1978. Where, as in the case *sub judice,* an employer has reason to know that an employee is qualified for a position and that the employee might desire to be considered for that position, the employer's failure to consider the employee for promotion is not a legitimate, nondiscriminatory reason sufficient to rebut an inference of intentional disparate treatment successfully raised under the *McDonnell Douglas* test.

Arnold's informal methods necessarily and intentionally favored those who moved within his social circles—*i.e.,* white people. *See Carmichael,* 738 F.2d at 1133 & n. 2; *Payne,* 673 F.2d at 827; *Rowe,* 457 F.2d at

359. In light of Arnold's methods, a black man stood little chance of getting this promotion. This "method" of promotion patently failed to afford a black man the equal treatment which Title VII demands. The record clearly supports the District Court's conclusion that GMH failed to rebut the inference that impermissible racial criteria fatally infected GMH's decision-making process.

Upon a careful review of the record, we find substantial evidence supporting the District Court's finding that Roberts satisfied his burden under the *McDonnell Douglas* test, thereby raising the inference that discriminatory intent motivated Arnold in his promotion decision, and that GMH's attempts to rebut the inference were illegitimate and pretextual in nature. Moreover, in the absence of racially disparate treatment, Arnold would have offered the job to Roberts. Accordingly, the District Court was correct in awarding relief on Roberts' 1981 claim.

### B. The 1978 Incident

As to the 1978 incident, the record clearly supports the District Court's determination that Roberts suffered disparate treatment. GMH presented no persuasive legitimate reason for the unconscionable disparity between the hourly wage of $4.42 that Wilhoit earned prior to resigning, the $3.50 wage that GMH's then-administrator, Ed Carter, offered Roberts to assume Wilhoit's position, and the $5.50 wage ultimately given to the white male who received the position.

There is no reason in the record as to why GMH could accommodate Wilhoit's wage one month, but could not accommodate it the next. The record indicates that the normal practice of the hospital was to offer a raise in pay incident to a promotion, and this was not done. The sole purported justification for the glaring jump in pay offered to Beach was that, as a "master electrician," he would ultimately *save* the hospital money by making it unnecessary to hire independent contracting for expensive electrical repairs.

The record demonstrates the disingenuous nature of this attempted exculpation. Internal memoranda between hospital administrative personnel show that "by no stretch of the imagination" could one describe Beach as a master electrician. One did not have to resort to subtle detective work to discover Beach's shortcomings; they were patently obvious and profound. It is clear that Beach was never qualified at all for the position of Maintenance Supervisor, let alone at a rate of pay nearly 160% of that offered to Roberts. In any case, as the District Court noted, the record presents no legitimate reason why GMH would have offered the job to Roberts for less than Wilhoit's wage.

Conversely, as we have noted above, the record substantially supports the District Court's finding that Roberts was qualified for the promotion in 1978 and that inasmuch as GMH offered no legitimate reason for the glaring disparity between the wage offered to Roberts and that paid to two white men for performing the same work, the record substantially supports the District Court's finding of disparate treatment in the context of the 1978 incident.

Had Roberts timely filed a charge of discrimination subsequent to the 180–day filing period after the occurrence of the 1978 incident, the District Courts award of relief for the period beginning in that year would have been correct. Roberts, however, although he admittedly knew that GMH had racially discriminated against him, did not file a timely charge. (R1–12–104, 106 (Deposition of Charles Roberts)). Therefore, unless the 1978 incident and the 1981 incident were so sufficiently related as to constitute a continuing violation, Roberts' claim for relief stemming from the 1978 incident and the period prior to the 1981 incident were time barred and the District Court erred in granting relief for that period.

### C. The Continuing Violation

Under the continuing violation doctrine, "[i]f a series of discrete acts of discrimination continues into the statutory filing period, then the cause of action is considered

timely filed." *Coleman v. Clark Oil & Refining Co.*, 568 F.Supp. 1035, 1040 (E.D. Wis.1983). To revive the otherwise time-barred claim under the doctrine, however, it must be part of a pattern or continuing practice out of which the timely-filed incident arose. *See United Air Lines v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977).

When an employee files a timely charge for a discriminatory act, he may recover for previous acts of discrimination which would otherwise be time-barred to the extent that he can meet his burden of proving the existence of a substantial nexus between the acts. *See Milton v. Weinberger*, 645 F.2d 1070, 1077 (D.C.Cir.1981). In *Milton*, the District of Columbia Circuit refused to apply the continuing violation doctrine to resurrect several otherwise time-barred claims in which an employer denied promotions allegedly on the basis of race when the plaintiffs failed to allege a nexus between the events. The court noted that to allow a more liberal application of the doctrine would provide an end-run around the policy underlying Title VII's 180–day filing requirement: Protecting employers from the burden of having to defend against claims arising out of remote managerial decisions. *Id.* This policy seems particularly applicable here because Roberts admitted that he knew at the time of the 1978 incident that he had suffered racially disparate treatment. He easily could have preserved his rights at that time. *See Dumas v. Town of Mount Vernon, Alabama*, 612 F.2d 974, 978 (5th Cir.1980) (citing *Elliott v. Sperry Rand Corp.*, 79 F.R.D. 580, 585 (D.Minn.1978)).

The continuing violation doctrine does not exist to give a second chance to an employee who allowed a legitimate Title VII claim to lapse. It is only when a substantial nexus exists between a timely-filed claim and an otherwise time-barred claim that they may be viewed as constituting a single violation, part of which falls within the limitations period. Moreover, the existence of such a nexus serves to alleviate the employer's burden in defending a remote managerial decision. In principle, much of the evidence that the employer would need to proffer in defending against the timely-filed claim should be relevant to his defense against the time-barred claim as well.

■ In determining the existence *vel non* of such a nexus, a court should not rely upon a superficial factual analysis, but rather, should refer to a variety of factors. Such factors include whether the claims were related in subject matter, frequency, and permanence (*i.e.*, whether the act was sufficiently permanent in nature so as to "trigger an employee's awareness of and duty to assert his or her rights"). *Berry v. Board of Supervisors of L.S.U.*, 715 F.2d 971, 981 (5th Cir.1983), *cert. denied,* —— U.S. ——, 107 S.Ct. 232, 93 L.Ed.2d 158 (1986). The first factor, the subject matter of the discrimination, was different in each event. Although they both involved injury in the context of a promotion decision, they were different in several critical respects.

First, in 1978, GMH offered the position to Roberts, albeit at a different rate. Ed Carter, the administrator in 1978, actually considered Roberts for the promotion, but failed to offer the position at fair terms. In 1981, by contrast, Administrator Arnold never considered Roberts for the position when he had a duty to do so. Clearly, these two unfortunate incidents arose from entirely different transgressions in the decisionmaking processes. The former resulted from a wrongful discounting of the value of Roberts' work; the latter resulted from a wrongful discounting of Roberts' abilities.

The only commonality between the two incidents was the fact that they both had the same result: Roberts did not receive a promotion opportunity on fair terms. As the Supreme Court noted, mere commonality of effect is not sufficient to invoke the continuing violation doctrine. *See United Air Lines v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); *Scarlett v. Seaboard Coast Line Railroad Co.*, 676 F.2d 1043, 1050 (5th Cir. Unit B 1982).

The second factor which the Fifth Circuit set forth in *Berry*, frequency, also suggests that the two incidents were not suffi-

ciently related to invoke the doctrine. 715 F.2d at 981. Although under appropriate circumstances, two incidents three years apart may be enough to demonstrate the existence of a continuing violation, the facts before us do not properly present such a case. For example, two *identical* discriminatory incidents separated by three years might properly constitute a continuing violation. Where, however, as in the case at bar, two *incongruent* discriminatory events are separated by a substantial time hiatus, the hiatus further supports the conclusion that the two incidents were discrete and unrelated.

Finally, as to the permanence factor, which the Fifth Circuit suggested was the most important of the three,[1] Roberts admitted that he was aware of his rights in 1978. He could have asserted them at that time. GMH was able to injure Roberts again only because he knowingly failed to exercise his rights. A claim arising out of an injury which is "continuing" only because a putative plaintiff knowingly fails to seek relief is exactly the sort of claim that Congress intended to bar by the 180–day limitation period.

Moreover, as the Fifth Circuit noted in *Berry,* that list of factors is not exhaustive. Here, the record shows that the two decisions were made by different decisionmakers, one of whom offered the position to Roberts, though on disparate terms, the other of whom refused to even consider Roberts. The only facts common to both incidents was the identity of the employee and of the entity employing the discriminatory decisionmaker. Such an identity will *always* exist where a Title VII plaintiff seeks relief after allowing his rights to lapse. Thus, this identity by itself is not persuasive.

The record does not offer a shred of evidence suggesting that there was any sort of *policy* or *system* to keep this highly qualified man down. *See Clark v. Olinkraft, Inc.,* 556 F.2d 1219, 1222 (5th Cir. 1977). Two discrete events had the net

effect of doing so, but it was Roberts' burden to submit sufficient competent evidence demonstrating some connexity between the incidents. *Cf. Scarlett v. Seaboard Coast Line Railroad Co.,* 676 F.2d 1043 (5th Cir. Unit B 1982). This he failed to do.

The District Court essentially found a continuing violation based solely on the identity of employee and employer. The court appeared to reach this conclusion because the effect of the discriminatory incidents was the same: the job wrongfully went to a lesser-qualified white man each time. The District Court erred as a matter of law in considering the continuing effects of time-barred acts in deciding whether a nexus between the two acts existed. *See United Air Lines v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). The identity of the parties to the discrimination is not sufficient to invoke the continuing violation doctrine. To hold otherwise would render meaningless the 180–day filing requirement of the statute. *See Burnam v. Amoco Container Co.,* 755 F.2d 893 (11th Cir.1985). The District Court erred in finding the existence of a continuing violation.

Accordingly, Roberts claim arising out of the 1978 incident is barred as untimely. Although we find the circumstances surrounding the 1978 incident particularly repugnant, it is not for us to neutralize so explicit a Congressional mandate as the 180–day filing requirement. Therefore, the District Court's finding that the 1981 incident constituted a violation of Title VII was not clearly erroneous and is AFFIRMED and its finding that the 1981 and 1978 incidents constituted a "continuing violation" is REVERSED. We REMAND this case to the District Court with instructions to Dismiss the 1978 claim as time barred, to reduce the damages awarded to the Plaintiff to the extent that they are not recoverable solely as a result of the 1981 violation, and to limit Roberts' award of

---

**1.** Compare *Dumas v. Town of Mount Vernon, Alabama,* in which we noted, "The focus is on what event, in fairness and logic, should have alerted the average lay person to act to protect his rights, or when he should have perceived that discrimination was occurring." 612 F.2d 974, 978 (5th Cir.1980) (citing *Elliott v. Sperry Rand Corp.,* 79 F.R.D. 580, 585 (D.Minn.1978)).

attorneys fees solely to those resulting from prosecuting the 1981 claim.

HILL, Circuit Judge, specially concurring:

My review of this case leads me to believe that, had I been burdened with the task of determining discrimination *vel non*, I should have found none. However, that burden was properly upon the district judge who heard the evidence, observed the witnesses and employed fact finding skills sharpened by bearing the burden in case after case. I cannot say that the trial judge's finding of discrimination in 1981 is without support in the evidence. I concur, therefore, in the result of Part A of Judge Spellman's opinion and concur in all said in the rest of the opinion. *See Pullman–Standard v. Swint,* 456 U.S. 273, 290, 102 S.Ct. 1781, 1791, 72 L.Ed.2d 66 (1982) (court of appeals may reverse district court's finding of discriminatory intent only if clearly erroneous).

My concerns are along these lines. Federal law controls and denounces *racial discrimination* in employment. One who gets a "raw deal" because of race—or, in other cases, sex, age, etc.—may find relief in federal courts.

Nevertheless, an individual employee may be given a "raw deal" in a personnel action in the absence of any discrimination forbidden by law. Most people outside the employing unit never hear of the unfair personnel action. Fair minded people who do learn of it naturally yearn to correct it. Given power to do so, one might correct the injustice even though the exercise of power exceeds authority.

Federal judges are fair minded people. They have impressive power. In the area of employment, promotion, discharge, demotion, etc., their *authority* is not plenary. Federal courts must correct injustices resulting from violations of federal law. The temptation to decide, in other cases, who is

"right", the boss or the employee, should be resisted. This is so, I submit, even where the employee who is unfairly treated is a member of a protected group. If the "raw deal" was *not* related to (in this case) race, federal law and federal courts are not implicated. Members of protected groups are not "wards of the court"; federal judges are not guardians to correct injustices wherever they involve minority races, the elderly, or those of a mistreated sex. Nevertheless, where the victim of personnel action which is the proverbial "raw deal" is a member of a minority race, there are some valid implications. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) (evidence that a deserving member of a suspect class lost a job opportunity to a person not part of such a class establishes a *prima facie* case of unlawful discrimination). History has been acknowledged; because racial discrimination in employment has been so pervasive, the employer is required to come forth with an explanation. That is as it should be.

Taking the above, then, as the "... right point of view,"[1] my review of this case is troubling.

Mr. Roberts may well have been handed "a raw deal."[2] Clearly, under the *McDonnell Douglas* analysis, he presented a *prima facie* case. My concern stems from the fact that the hospital made out a strong case that, whatever motivated its administrator in his personnel action, it was not race. The hospital presented uncontroverted proof of the following personnel actions by its administrator, Ken Arnold:

(a) On October 31, 1981, he promoted Archie Albritton, a black male, from staff registered nurse to head nurse in the emergency room.

(b) On October 19, 1981, he promoted Ann Knight, a black female, to the posi-

---

1. *See Ellison v. Georgia R.R. Co.,* 87 Ga. 691, 706–707, 13 S.E. 809 (1891) (Bleckley, Chief Justice) ("When the right point of view is discovered, the problem is more than half solved.").

2. Such a finding is far from demanded. Roberts had been, for years, a member of a maintenance department which had a deplorable record of non-performance or faulty performance.

tion of House Supervisor, which is third in the chain of command at the hospital.

(c) On October 13, 1981, he promoted Amanda Stevens, a black female, to the position of House Supervisor for the third shift. During her shift, Ms. Stevens had operational command of the hospital.

(d) On November 20, 1981, he promoted Deborah Yates, a black female, from registered nurse to House Supervisor for the second shift.

(e) He was responsible for recruiting one of the county's first black physicians, Dr. Jessie Furlow, to the area. Arnold set up interviews with the hospital staff and helped Dr. Furlow arrange financing to open her practice in Quincy.

Perhaps in this case the administrator foolishly placed too much emphasis on the college degree held by the person hired as supervisor; perhaps he chose a supervisor at barbecues or from among his "drinking buddies." If this sort of management ill serves the hospital, the hospital may wish to make other arrangements. Unless, though, the administrator has been shown, by direct or circumstantial evidence, to have taken the action he did as an act of discrimination against Roberts on account of Roberts' race, it is not a federal court matter.

By finding that the *prima facie* case coupled with the informal, secretive and subjective decision process constitutes circumstantial evidence of discrimination sufficient to overcome the direct evidence that the administrator harbored no such intent, the case was carried. I cannot say that the trial judge could not have so found, whether I should have or not.

Therefore, I concur.