**Satya P. JINDAL, Plaintiff,**

**v.**

**NEW YORK STATE OFFICE OF MENTAL HEALTH and Nathan Kline Institute, Defendants.**

**No. 88 Civ. 4390(RPP).**

United States District Court,
S.D. New York.

Jan. 25, 1990.

Law Offices of Michael H. Sussman by Michael H. Sussman, Yonkers, N.Y., for plaintiff.

Robert Abrams, Atty. Gen., State of N.Y., Dept. of Law by Ronald Turbin, Asst. Atty. Gen., New York City, for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND DECISION

ROBERT P. PATTERSON, Jr., District Judge.

This is a Title VII civil rights action brought under 42 U.S.C. § 2000e, *et seq.*, by Dr. Satya Jindal against his employers, which was tried on five days in October and November 1989. The following constitutes the Court's findings of fact and conclusions of law.

### I. FACTS

Dr. Satya Jindal, an organic chemist employed as a Research Scientist IV, grade 27, at the Nathan Kline Institute for Psychiatric Research (the "Institute") charges that the Institute's failure to promote him above grade 27 from 1981 to the present is the result of unlawful discrimination on the basis of national origin. He seeks retroactive promotion to Research Scientist V, grade 31, which amounts to a $4,000 raise, with back pay to May, 1987. *See* Plaintiff's Proposed Conclusions of Law at ¶ 21.

The Nathan Kline Institute is a multi-disciplinary research organization, which is separately administered within defendant New York State Office of Mental Health ("OMH"). The Institute focuses its research in the area of mental illness, including chronic mental illness, major psychosis, dementia and depression.

Senior level promotions (above grade 25) at the Institute are based on a peer review

system similar to that used at major universities. Under this system, which is designed to award promotions on the basis of merit, a committee of scientists (the "Peer Review Committee") weighs the merits and achievements of colleagues whose names are proposed for promotion by their division chiefs or by self-proposal. The committee members vote on each candidate for promotion and they recommend to the Director those candidates receiving a majority of votes. Peer review promotions are ostensibly based on the measure of the person, as opposed to a promotion system based upon several qualified candidates competing for a higher ranked position. The Peer Review Committee at the Institute has been composed, during the relevant period, of white males.

Dr. Jindal is an East Asian who was born and raised in India, where he attended college. Later he attended graduate school at Case Western Reserve University in Cleveland, earning his Ph.D. in organic chemistry in 1965. Thereafter, he pursued postdoctoral studies at Northwestern University and Case Western Reserve University. He also worked at the Worcester Institute for Experimental Biology and the Medical University of South Carolina before coming to the Institute in 1975. Dr. Jindal came to the Institute possessing special training in gas chromatography and mass spectrometry ("GC/MS"), a then emerging technology. GC/MS permits users to disaggregate more complex drugs into their molecular structure and identify substances at a molecular level in samples of blood, urine, or other specimens used for scientific analysis.

At the Institute Dr. Jindal, who was hired as a Research Scientist I, grade 19, worked with Dr. Per Vestergaard on specific projects which, for the most part, involved analysis of the molecules of cocaine by use of GC/MS, and then identifying the metabolites of cocaine in the urine of patients and animals. Dr. Jindal was the first scientist to develop stable isotope labels for cocaine. This work led Dr. Jindal

to collaborate on eleven scientific papers with Dr. Vestergaard between 1977 and 1979. He received several promotions and by 1979 achieved the level of Research Scientist III, grade 25. These promotions, which were made by Dr. Kline, then Director of the Institute, did not require action by the Peer Review Committee. During this period Dr. Jindal collaborated with other scientists. Dr. Vestergaard regarded Dr. Jindal's work as "very excellent" and in May 1979 requested that Dr. Jindal be again promoted.[1]

In April 1980 Dr. Vestergaard reiterated the request and soon thereafter the Peer Review Committee unanimously recommended Dr. Jindal's promotion to the next grade, grade 27, his present rank. However, Dr. Jindal did not receive that promotion immediately. All recommendations of the Peer Review Committee were subject to the approval of Dr. Kline. Dr. Kline asked the administrative assistant of the Peer Review Committee for additional information on Dr. Jindal, and his Deputy Director, Dr. Nagle, made a similar inquiry, although he had voted for the promotion as a member of the Peer Review Committee.

Since the Peer Review Committee had met in June, 1980, Dr. Jindal inquired of Dr. Kline in September 1980 as to the status of his promotion. In an October 1980 reply, Dr. Kline implied that Peer Review Committee action was still required under a new policy and that the committee would meet again in April. In March the Peer Review Committee administrative assistant asked Dr. Kline whether Dr. Jindal should be considered at the April 1981 meeting and was directed to hold the matter over until the June meeting. There is no evidence that Dr. Jindal's promotion was acted on at the June meeting of the Committee. During this period, Dr. Vestergaard made another request for Dr. Jindal's promotion and Dr. Kline finally acted in August 1981, approving Dr. Jindal's pro-

---

1. By this time, Dr. Jindal had been placed in charge of the "Common Use Laboratory" which housed the GC/MS unit. Dr. Jindal was to run the unit, and other scientists with projects having need for GC/MS work were to come to him for service.

motion to grade 27 more than two years after Dr. Vestergaard's original request.[2]

Dr. Vestergaard left the Institute in August 1981. Dr. Kline then acted as Dr. Jindal's sole supervisor. Dr. Kline signed annual evaluations of Dr. Jindal's performance, none of which were critical of Dr. Jindal's performance. Significantly, Dr. Jindal's performance in 1982 was evaluated at "above job rate." In September 1982, Dr. Kline appointed the present Peer Review Committee for the Institute; its members were all non-minorities.

In December 1982 Dr. Kline died, and Dr. Robert Cancro, the present Director of the Institute, replaced him. In June 1983 Dr. Cancro ordered a reorganization of the Institute, placing Dr. Jindal and his assistant, Teresa Lutz, under Mr. Thomas Cooper in the newly-formed Division of Analytical Psychopharmacology. Mr. Cooper then developed "General Guidelines" for his Division, which placed restrictions on proposed collaborations and individual research projects.

Although Dr. Jindal's annual performance, as evaluated by Mr. Cooper in the following years, 1983—1987, remained "highly effective," and although Mr. Cooper never indicated to Dr. Jindal that there were any serious deficiencies in his performance, Mr. Cooper did not suggest Dr. Jindal to the Peer Review Committee for promotion. In fact, during those years, Mr. Cooper never considered whether or not Dr. Jindal should be promoted.

In contrast, during that period the Institute promoted several non-East Asian scientists to grades above 27. They include Maarten Reith (grade 31), Barbara Feitel (grade 31), Morris Meisner (grade 35), Micky Kohn (grade 35), Leslie Prichep (grade 31), and Mr. Saito (hired at grade 31).

In May 1987, Dr. Jindal wrote the Commissioner of OMH and complained that he had not been promoted or considered for promotion since 1981. In June, OMH replied by letter to Dr. Jindal, stating Dr. Cancro had annually reviewed the performance evaluations for Dr. Jindal as part of the Institute's peer review process. It also said that if the Division Chief, Mr. Cooper, and the director agree that an employee should be considered for peer review, nomination to the Peer Review Committee is made at that time. According to the evidence presented at trial, this demonstrates a clear misunderstanding by OMH of the process being followed at the Institute. Dr. Cancro testified that he did not routinely review the evaluations of NKI employees nor conduct annual meetings at which he and Mr. Cooper discussed the evaluations of Mr. Cooper's subordinates. Although Dr. Cancro received a copy of OMH's response, he made no attempt to correct the discrepancy. In fact, Dr. Cancro testified at trial that he had not reviewed any of Dr. Jindal's evaluations until after the filing of this lawsuit, did not routinely review evaluations of Institute employees, and did not have annual meetings with Mr. Cooper to discuss Mr. Cooper's performance evaluations.

After seeing Dr. Jindal's letter to the Commissioner of OMH, Dr. Cancro asked Mr. Cooper to review Dr. Jindal for promotion, but Mr. Cooper did not report back. Dr. Cancro did not pursue the matter, and in 1987 no peer review of Dr. Jindal resulted. This lawsuit followed.

## II. DISCUSSION

### A. *Liability*

In *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court established the analytic process to be used for evaluating evidence of discrimination in Title VII cases. *See also Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). The process is as follows: (1) the plaintiff must present evidence sufficient to make out a *prima facie* case of discrimination; (2) the

---

**2.** Defendants claim that this delay in promotion of over two years was due to a job freeze and a reorganization process. There was no evidence presented of a reorganization in that period and the job freeze is claimed to have lasted only about six months during this period. Dr. Jindal successfully passed a one year probationary period which followed.

defendant must then articulate a legitimate, nondiscriminatory reason for its decision not to employ the plaintiff; and (3) the plaintiff must then prove that the reason given is a pretext. *McDonnell Douglas*, 411 U.S. at 807, 93 S.Ct. at 1826. *See also Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Board of Trustees of Keene St. Col. v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978).

The classic formulation of the *prima facie* case is that the plaintiff must show that he belongs to a recognized minority group; that he applied and was qualified for a job for which the employer was seeking applicants; that, despite his qualifications, he was rejected; and that, after his rejection, the position remained open and the employer continued to seek applicants from people of the plaintiff's qualifications. *Hudson v. International Business Machines Corp.*, 620 F.2d 351, 354 (2d Cir.), *cert. denied*, 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980).

■ The Supreme Court has made it clear, however, that the *McDonnell Douglas* test is not the exclusive method by which a plaintiff may establish his *prima facie* case. *International Broth. of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). The plaintiff may meet his initial burden simply by "offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act," *id.* at 358, 97 S.Ct. at 1866, *i.e.*, evidence that indicates that "it is more likely than not" that the employer's actions were based on unlawful considerations.

In either event, if the plaintiff fails to establish his *prima facie* case, the defendant is entitled to judgment. On the other hand, if the plaintiff establishes his *prima facie* case, and the defendant then asserts a legitimate, nondiscriminatory reason for its adverse employment decision, the third step requires the plaintiff to show that the alleged nondiscriminatory reason is not the true reason, but rather is a pretext for discrimination. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093.[3]

■ In this case plaintiff has established a *prima facie* case of discrimination under *McDonnell Douglas* and *Burdine*, in that he is an East Asian born in India;[4] he was qualified for the position, grade 31, by dint of his Ph.D. in organic chemistry, his many years of experience as a research scientist, and his fulfillment of the stated qualifications in plaintiff's Exhibit 44, Regulations of the Office of Mental Health, p. 6, which requires a doctorate and three years of professional research experience in the field or a masters degree and five years of such experience. Plaintiff has also established that his supervisor, Mr. Cooper, had the authority to recommend him to the Peer Review Committee for promotion but failed to; that, as a consequence, he was not promoted, and that others with substantially equal or lesser qualifications than he during the period were promoted after peer review.

Turning to step two of the *McDonnell Douglas* framework, Defendants' position is that there are several non-discriminatory reasons for the failure to promote Dr. Jindal. At this stage, the defendant must show, "through the introduction of admissable evidence, the reasons for plaintiff's rejection." *Burdine*, 450 U.S. at 255, 101

3. The Supreme Court's recent decision in *Price Waterhouse v. Hopkins*, — U.S. —, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), which held that an employer has the burden of proving by a preponderance of the evidence in a mixed-motive case that it would have made the same employment decision absent the discriminatory factors, does not affect the burdens applicable in a pretext case. *Id.*, 109 S.Ct. at 1789 n. 12 ("If the plaintiff fails to satisfy the factfinder that it is more likely than not that a forbidden characteristic played a part in the employment decision, then she may prevail only if she proves,

following *Burdine*, that the employer's stated reason for its decision is pretextual."). Since the present case has been argued by both sides as a pretext case, and the parties have made no allegation of mixed motives, the *Price Waterhouse* decision is not applicable. *See Gibbs v. Consolidated Edison Co. of New York*, 714 F.Supp. 85 (S.D.N.Y.1989).

4. Defendants do not dispute that Dr. Jindal is a member of a protected minority.

S.Ct. at 1094 (footnote omitted). If the employer articulates such a reason, the burden shifts back to the plaintiff at step three to convince the trier of fact that the stated reason is a mere pretext.

■ Defendant claims that Dr. Jindal was not promoted because he was not considered for promotion. This Court holds as a preliminary matter that, in a situation such as this, the employer does not articulate a nondiscriminatory reason for not promoting an employee by merely showing that the employee was never considered. The Court's research indicates that the Second Circuit has not ruled on this issue. It has noted, however, that an employer's failure properly to consider an employee for promotion, as a factual finding, tends to undermine the employer's effort to rebut the prima facie case that the plaintiff was treated "less favorably than others because of [his] race." *Cowan v. Prudential Insurance Co. of America*, 852 F.2d 688 (2d Cir.1988).

In *Cowan*, the Court of Appeals affirmed a decision of the District Court of Connecticut holding that, where the person who made the promotion decision testified that he never even considered the plaintiff for promotion, the employer could not rely on proof that the plaintiff was at best equally qualified as the employees actually promoted to avoid a finding of racial discrimination. As Judge Winter, sitting by designation as a district judge, said, "[e]ven if each promotion was a 'horse race,' [plaintiff] should have been allowed to run." *Cowan v. Prudential Insurance Co.*, 703 F.Supp. 177, 187 (D.Conn.1986). Judge Winter further explained:

> Because the evidence establishes that [plaintiff] had overall qualifications at least equal to those of the [employees]

promoted, he should have been considered for the promotions received by those agents. ... Under these circumstances, the inference that racial motives were involved in the failure to consider [plaintiff] for promotion is inexorable.

*Id.* at 188.

Another circuit has held that, where an employer has reason to know that an employee is qualified for a position and that the employee might desire to be considered for that promotion, the employer's failure to consider the employee for promotion is not a legitimate, nondiscriminatory reason sufficient to rebut an inference of intentional disparate treatment successfully raised under the *McDonnell Douglas* test. *Roberts v. Gadsden Memorial Hospital*, 835 F.2d 793, 798 (11th Cir.1988). *See also Carmichael v. Birmingham Saw Works*, 738 F.2d 1126 (11th Cir.1984). Accordingly, the Court finds that the defendants' failure to consider Jindal for promotion is insufficient to meet the requirements of step two of the *McDonnell Douglas* test.

■ Defendants also claim that Dr. Jindal was not promoted because he failed to apply for a promotion between 1983 and 1987.[5] This position somewhat begs the question. In the first place, Dr. Jindal testified that he was unaware of this opportunity.[6] But, more importantly, it is undisputed that Mr. Cooper had authority to nominate without plaintiff's self-nomination and yet never considered him. He maintained he did not feel strongly about defendant's promotion one way or the other, and never actually determined whether plaintiff was promotable. OMH's letter of June 22, 1987 to Dr. Jindal indicated that it was OMH's understanding of the peer review promotion process that a supervisor would review annually all staff members

---

**5.** Defendants also appear to be claiming that Dr. Jindal failed to show that he applied for a promotion and therefore did not state a *prima facie* case. Courts have held, however, that when the failure to promote arises out of an informal, secretive process, a plaintiff may raise an inference of intentional disparate treatment without proving that he technically applied for and failed to obtain the promotion. *See, e.g., Roberts v. Gadsden Memorial Hospital*, 835 F.2d at

797; *Carmichael v. Birmingham Saw Works*, 738 F.2d at 1133.

**6.** Dr. Cancro testified that he articulated this opportunity in a major speech to staff in 1983. However, this right was not enunciated in any of the written materials, and even Dr. Lajtha, Chairman of the Peer Review Committee, could not recollect Dr. Cancro making such an announcement during that staff meeting.

for promotion and advise the Director that such reviews had been made. It was not unreasonable for Dr. Jindal to have had the same understanding of the process. His failure to apply formally for a promotion is therefore not a defense.

Furthermore, in May 1987, following Dr. Jindal's complaint to OMH, Dr. Cancro asked Mr. Cooper to review Dr. Jindal's qualifications for promotion. Mr. Cooper never responded and Dr. Cancro never pursued the matter. Therefore, before suit was filed, defendants were on notice of Dr. Jindal's desire to be promoted, and defendants took no action, affirmatively or negatively. Accordingly, this Court finds that a preponderance of the evidence shows defendants' claim that Dr. Jindal knew of the self-nomination process but failed to apply for a promotion is a pretext.

■ Defendants also presented evidence that Dr. Jindal does not and did not meet the standards which would have been applied by the Peer Review Committee, and, thus, for Mr. Cooper to have nominated him would not have resulted in a promotion in any event. This line of proof does not amount to a legitimate and non-discriminatory reason why Dr. Jindal was never *considered* for promotion.[7] An employer's *post hoc* comparison between the promoted employees and the plaintiff does not articulate a legitimate nondiscriminatory reason for failing to consider the plaintiff for the promotion. *Lams v. General Waterworks,* 766 F.2d 386, 389 (8th Cir.1985). *See also Nanty v. Barrows Co.,* 660 F.2d 1327, 1332 (9th Cir.1981) (where plaintiff was summarily rejected for job, employer's arguments explaining why plaintiff would not have been hired had he been considered "are simply not relevant [in determining liability], since none explains *the reason for [plaintiff's] rejection.").* Similarly unavailing are defendants arguments that Dr. Jindal was not considered because of incidents that may have occurred but were never part of any decision that Dr. Jindal was not promotable. Mr. Cooper specifical-

ly testified that he never determined whether Dr. Jindal was promotable or not. Thus, to the extent defendants rely on Mr. Cooper's testimony concerning certain incidents involving Dr. Jindal, the Court finds that they are advancing a pretextual argument.

■ Finally, defendants assert that the fact that Mr. Cooper has hired, promoted or recommended for peer review other minorities is evidence that Dr. Jindal was not discriminated against on the basis of his national origin. Because Dr. Jindal is claiming that he was discriminated against on the basis of his national origin, evidence as to the treatment of minorities other than East Asians/Indians is irrelevant. Mr. Cooper testified that, in his capacity as a division chief at the Nathan Kline Institute, he hired and promoted an "Asian Indian", Dr. Bagchi. However, Dr. Bagchi, a grade 11, was at a much lower level than Dr. Jindal, and her promotion therefore did not require peer review; instead, it was simply an administrative matter handled by Mr. Cooper. This evidence, then, is not inconsistent with Dr. Jindal's claim that he was not considered for an upper-level promotion because of his national origin.

Defendants also rely on evidence that Mr. Cooper recommended for promotion to grade 31 an "Asian Indian" working at the New York State Psychiatric Institute, a separate organization at Columbia University under the auspices of OMH at which Mr. Cooper was also a division chief. However, the evidence is clear that the Psychiatric Institute's peer review system is different from that at the Nathan Kline Institute. There is no evidence showing what those differences are or whether considerations similar to those applicable to Dr. Jindal at NKI are taken into account in promotion at the Psychiatric Institute. Furthermore, there is no evidence in the record of the circumstances surrounding Mr. Cooper's recommendation of Dr. Perumal for promotion. The fact that Mr. Cooper recommended an "Asian Indian" for pro-

---

7. This line of proof is relevant, however, to the issue of the remedy to be afforded plaintiff. *See* *infra.*

motion at a different organization does not by itself rebut the inference of discrimination raised by the fact that Dr. Jindal has not been considered for promotion since 1981 while other non-East Asians have.

To summarize, plaintiff established his *prima facie* case as required under *McDonnell Douglas*, raising the inference that defendants discriminated against him by failing to promote him. To rebut that inference, defendants were required to articulate a legitimate, non-discriminatory reason for not promoting Dr. Jindal. They first asserted that Dr. Jindal was never considered for promotion. This was held not to constitute a legitimate, non-discriminatory reason. Defendants also attempted to meet its burden by claiming that Dr. Jindal's poor performance meant that he would not have been promoted, but this was held to be irrelevant to the decision not to consider him. Finally, defendants asserted that plaintiff's failure to apply for a promotion was the reason for defendants' failure to consider him. This being a legitimate, non-discriminatory reason, the burden shifted back to plaintiff to prove that it was pretextual, which he accomplished by showing that there was no requirement that he do so and that defendants were aware of his desire to be promoted.

Plaintiff has therefore carried his burden of proving by a preponderance of the evidence that defendants' asserted non-discriminatory reasons for failing to promote Dr. Jindal are in fact pretexts for discrimination against him on the basis of his national origin. Accordingly, under the case law, the liability of the defendants is established and the only remaining question is the proper remedy.

### B. *Remedy*

■ Dr. Jindal seeks retroactive promotion to grade 31 with back pay to May, 1987 as relief for defendant's discrimination against him.[8] A finding of a violation of Title VII presumptively entitles a plaintiff to back pay and retroactive promotion.

*Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). In a case such as this, where a legitimate candidate for promotion is never considered for the promotion because of unlawful discrimination, he is entitled to such relief unless the employer shows that, absent the discrimination, the plaintiff still would not have received the promotion. *Nanty v. Barrows Co.*, 660 F.2d at 1333. *See also Fields v. Clark University*, 817 F.2d 931, 937 (1st Cir.1987); *Bibbs v. Block*, 778 F.2d 1318, 1324 (8th Cir.1985); *Blalock v. Metals Trades, Inc.*, 775 F.2d 703, 711 (6th Cir.1985); *Miles v. M.N.C. Corp.*, 750 F.2d 867, 875 (11th Cir.1985); *Smallwood v. United Airlines*, 728 F.2d 614, 620 (4th Cir.1984); *Day v. Matthews*, 530 F.2d 1083, 1085 (D.C.Cir.1976) (per curiam).

The burden is on the employer because "its unlawful acts have made it difficult to determine what would have transpired if all parties had acted properly." *League, etc. v. City of Salinas Fire Dept.*, 654 F.2d 557, 559 (9th Cir.1981) (citing *Day v. Matthews*, 530 F.2d 1083 (D.C.Cir.1976)). Some courts have required the defendant to make such a showing by "clear and convincing" evidence. *See, e.g., Smallwood v. United Airlines*, 728 F.2d at 620 (4th Cir.); *Nanty v. Barrows Co.*, 660 F.2d at 1333 (9th Cir.); *Marotta v. Usery*, 629 F.2d 615, 618 (9th Cir.1980); *Day v. Matthews*, 530 F.2d at 1085 (D.C.Cir.). Others have required proof by only a preponderance of the evidence. *See, e.g., Fields v. Clark University*, 817 F.2d at 937 (1st Cir.); *Bibbs v. Block*, 778 F.2d at 1324 (8th Cir.); *Blalock v. Metals Trades, Inc.*, 775 F.2d at 711 (6th Cir.); *Miles v. M.N.C. Corp.*, 750 F.2d at 875 (11th Cir.). The Second Circuit apparently has not addressed the issue of the weight of evidence required. In light of the recent statements by a plurality of the Supreme Court in *Price Waterhouse v. Hopkins*, 109 S.Ct. at 1792, that the preponderance standard is appropriate at the liability stage, this Court will also apply that standard at the remedial stage. Thus,

---

**8.** The consequences of a promotion for Dr. Jindal are higher pay and a new title, but not necessarily greater responsibilities.

at this stage, the burden is on the defendants to prove by a preponderance of the evidence that Dr. Jindal would not have been promoted even without the discrimination.

■ In attempting to carry this burden, the defendants are hampered by the lack of any clearly defined standards by which high level promotions are made at the Institute. The peer review system is not committed to writing, nor are the reasons for those promotions which did occur recorded. The testimony of the Institute's administrators is in conflict as to how the process actually works. In practice, members of the staff sometimes are not considered for promotion for years, while others receive prompt attention from the Peer Review Committee. The criteria for promotion at the higher levels are almost entirely subjective, making it extremely difficult for this Court to determine what would have resulted had Dr. Jindal been put through the process.

In his testimony, Dr. Cancro described Dr. Jindal as a mediocrity as a scientist and undeserving of promotion, implying that Dr. Jindal was lucky to be employed by the Institute in his present capacity. Dr. Cancro pointed to what he claimed were Dr. Jindal's lack of sufficient publications, his failure to obtain more funding in grants, and his lack of collaboration with other scientists.

Plaintiff responds first by pointing to proof that some persons promoted to or hired at Grade 31 and higher during the same period had fewer published articles and fewer grants at the time of promotion or hire[9] than he did. For example, while Dr. Jindal had published 37 articles in distinguished refereed journals (17 as first author) and had been a co-investigator on one grant and a principal investigator on

his own grant, Maarten Reith had 14 similar publications (11 as first author), 8 chapters in books (4 as first author) and 11 abstracts (7 as first author), and had received no grants as principal investigator.

In general, the *curriculum vitae* of those promoted to or assigned grade 31 positions, such as Dr. Leslie Prichep, Dr. Morris Meisner, Dr. Barbara Feitel and Dr. Maarten Reith, did not show better publication and grant records at the time they were promoted than Dr. Jindal.[10] Accordingly, the Court finds that the defendants have not demonstrated by a preponderance of the evidence that Dr. Jindal would not have been promoted to grade 31 because he had insufficient publications and grants to warrant that promotion.

Defendants contend that some of these employees were promising or valuable to the institution in other ways, *e.g.*, administrators, mathematicians, statisticians hired out of school at grade 32, psychological testers not at a high level scientifically, and others. These purely subjective and *post hoc* distinctions do not persuade the Court that Dr. Jindal would not have been promoted had he been considered, especially in light of the evidence that Dr. Jindal was held to higher objective standards than these individuals. As part of his explanation of why Dr. Jindal did not have the credentials for promotion, Dr. Cancro suggested that a promotion to grade 31 is only available to people who are "household name[s]" in their disciplines, had been invited to give named lectureships here and abroad, and had been appointed to important review committees. However, there is no evidence in the record that certain others who were promoted to grades 31 and higher had any of those credentials when they were promoted to or hired at that level.

9. In at least one instance, defendants distinguished Dr. Jindal from a scientist who was hired at grade 31 on the basis of a work that the scientist did not publish until long after he was hired at that grade.

10. On several occasions, Dr. Cancro, who was not a member of the Peer Review Committee, indicated that the relative youth of those who

were promoted was relevant to their failure to meet these objective standards. This position is inconsistent with defendants' position in this litigation that the peer review process involves an objective weighing of the candidates' merits and achievements. It also raises further questions as to whether subjective tests of a discriminatory nature are used at the Institute.

Defendants also claim Dr. Jindal did not collaborate with other scientists sufficiently. A review of Dr. Jindal's record shows that his most effective collaboration was done while Dr. Vestergaard was at the Institute. Thereafter, he also collaborated with Dr. Donald S. Robinson of West Virginia and Mr. Cooper in 1980 through 1983, and with Dr. Bagchi on the grant of over $100,000 Dr. Jindal received from the National Institute on Drug Abuse, which continued from June 1984 to May 1987. Significantly, the annual evaluations Dr. Jindal included reviews of his collaborative efforts, which were never noted to be deficient or unsatisfactory. It appears that the issue of lack of collaboration was never raised with Dr. Jindal until after this lawsuit was initiated.

Even ignoring the fact that Dr. Jindal's collaborative efforts were not criticized, any lack of collaboration in the period 1983 to 1987 seems either to be based on uncorroborated hearsay or linked to circumstances outside his control. For example, Dr. Lajtha testified that he had concluded from hearsay reports that Dr. Jindal had not collaborated properly with Dr. Maarten Reith and Dr. Henry Sershen in 1982. Dr. Reith was called by the defendants and gave inconclusive testimony on this subject, indicating the fault was his as much as plaintiff's.

Other instances of failure to collaborate may well be the result of the reorganization and resulting limitations imposed by Mr. Cooper soon after Dr. Jindal was transferred to his department.[11] Mr. Cooper's "General Guidelines" for his department [12] appear to have had an impact on Dr. Jindal's productivity at the Institute. In effect, these guidelines restricted Dr. Jindal's freedom to collaborate by requiring him, *inter alia*, to devote 50% of his time to the psychopharmacology department's clinical program; to implement only those research protocols and proposals that "have a clear relationship to the overall program of the department and conform to the charge of the OMH research program for this Institute"; to submit all protocols and manuscripts to Mr. Cooper for his approval; to participate in the planning of protocols and experimental design, execution and preparation of final reports and manuscripts for publication; and to obtain Mr. Cooper's approval for all proposed collaborations. Dr. Jindal testified that, in several respects, these restrictions limited his ability to collaborate.

It is also significant that in Dr. Cancro, the Nathan Kline Institute has a part-time director, and in Mr. Cooper, Dr. Jindal has a part-time supervisor. Both director and supervisor have important and time consuming work at New York University and Columbia University,[13] respectively. Under these circumstances, Mr. Cooper's general guidelines might have required a greater degree of supervision and direction at the Rockland Research Institute, the division of the Nathan Kline Institute at which Dr. Jindal was stationed, to lead to appropriate collaboration, especially when research by two somewhat distant units in Rockland County and Wards Island had to be coordinated. Accordingly, the Court finds the defendants have not sustained their burden of proof that lack of sufficient collaboration would have been a basis for refusing to promote Dr. Jindal, had he been considered.

Mr. Cooper also testified regarding several incidents from which defendants ask the Court to infer that Dr. Jindal was unfit for promotion. He testified that Dr. Jindal was unable to synthesize the compound required for the "Pharmacokinetics and Metabolism of Phenelzine in Man" grant (1980–83), although Dr. Jindal had represented in the grant application that he would do so. Dr. Jindal's failure, Mr. Coo-

---

11. Most of Dr. Jindal's attempts to interest other researchers in utilizing GC/MS technology appear to have generally taken place under Dr. Vestergaard. Under Mr. Cooper, several of these efforts were discouraged.

12. Dr. Jindal had previously been in charge of a unit available to all scientists at the Institute and reported to the Director.

13. Indeed, during this period Mr. Cooper's unit at Columbia acquired a more advanced GC/MS unit which he elected to use it in his research.

per said, affected the grant adversely, causing lost time on the project, as well as a loss of money to the Institute. He also testified that Dr. Jindal had included Mr. Cooper's name on a 1978 published paper despite his objection, and that part of the publication was in error.

It is notable that Mr. Cooper, as a member of the Peer Review Committee, voted for Dr. Jindal's promotion to grade 27 in 1981, despite these two incidents.

Additionally, Dr. Jindal disputes these claims. He states that he suggested, and Mr. Cooper agreed, that it would be best to have an outside firm synthesize the compound for human consumption in view of the criticism Dr. Kline was receiving for having, as part of an experiment, administered to his private patients a laboratory-produced synthesized compound which did not have F.D.A. approval. He maintains he was always able to produce the phenelzine compound. With respect to the 1978 paper, Dr. Jindal testified that Mr. Cooper asked to be named as an author, although Mr. Cooper had had little to do with it or the experiments related therein.

Mr. Cooper also alleged failures in Dr. Jindal's performance subsequent to 1981. He criticized Dr. Jindal's failure to obtain from Dr. Midha of Vancouver the precursors needed for research of fluphenazine. Dr. Jindal responds that Dr. Midha was a friend of Mr. Cooper's, that he asked Mr. Cooper to introduce him to Dr. Midha for this purpose and was refused.

Mr. Cooper also indicated that several draft grant applications by Dr. Jindal had been sloppily prepared and demonstrated a lack of knowledge of basic grant requirements, and that Dr. Jindal's final grant applications had received low grades from proposed funders. This testimony stands in contradiction to Mr. Cooper's annual ratings of Dr. Jindal's performance as "highly effective."

The implicit conclusions of Dr. Cancro and Mr. Cooper that Dr. Jindal would not have been promoted even if he had been considered for promotion are countered by documentary evidence and testimony by Dr. Jindal. The testimony of all of these witnesses must be discounted in light of the interest each of them has in the outcome of this lawsuit: Dr. Jindal seeks an increase in pay; Dr. Cancro seeks to defend his downgrade of Dr. Jindal's role at the Institute; and Mr. Cooper seeks to show his failure to consider Dr. Jindal for promotion was not wrong.

While Mr. Cooper and Dr. Lajtha, the only members of the Peer Review Committee to testify, gave adverse testimony with respect to Dr. Jindal's performance, it does not follow necessarily that Dr. Jindal was not promotable to grade 31. Defendants did not show that, at the time they testified, these witnesses were familiar with all the information they would have considered in making a promotion decision as members of the Peer Review Committee. In fact, the Court sustained plaintiff's objection to a question to Dr. Lajtha—asking his opinion as to the merit of promoting Dr. Jindal to grade 31—on the ground that a proper foundation had not been laid for the question. (Tr. 400–02). The Court suggested to defense counsel the manner in which a proper foundation could be laid for the question to again be put to Dr. Lajtha, but defense counsel failed to do so. Nor did defendants present much evidence from the remaining members of the Peer Review Committee.

Mr. Cooper testified that he could not conclude on the basis of Dr. Jindal's publication rate alone that he was not fit for promotion. (Tr. 785). He further testified that he had no strong feelings, either in 1987 or at the time of his testimony, as to whether Dr. Jindal was fit for promotion to grade 31 (Tr. 788), and indicated that, had Dr. Jindal asked to be nominated for peer review, he "would have suggested to him that he needed more publications, or I may have put it forward and told him that it may go through or it may not, but I didn't feel very strongly either way." (Tr. 694).

Accordingly, it is the finding of the Court that, upon the proof presented at trial, the defendants have not shown by a preponderance of the evidence that Dr. Jindal did not possess the qualifications to pass a fair,

honest and non-discriminatory peer review for promotion to grade 31.

### III. CONCLUSION

The Court therefore orders that judgment be entered for plaintiff and that defendants promote Dr. Jindal to grade 31 effective May 1987, and that he receive back pay to that date. Plaintiff shall submit a proposed judgment on 5 days notice to defendants within ten days of the date of entry of this decision, and plaintiff has permission to file an application for attorneys' fees and expenses under 42 U.S.C. § 1988 within 30 days of the date of entry of this decision.

SO ORDERED.